STATE OF HAWAII, by its Attorney General, Bert T. Kobayashi, Plaintiff-Appellant, *v.* MAURICE ZIMRING, MOLLY ZIMRING, et al., Defendants-Appellees

NO. 5522

June 22, 1977

RICHARDSON, C.J., OGATA, J., VITOUSEK, Circuit Judge, for Kobayashi, J., disqualified, HAYASHI, Circuit Judge, for Menor, J., disqualified, and KATO, Circuit Judge, for the vacancy

OPINION OF THE COURT BY RICHARDSON, C.J.

The State of Hawaii, plaintiff-appellant, seeks to quiet title[1] in itself as against Maurice and Molly Zimring, defendants-appellees, and their predecessors-in-interest to approximately 7.9 acres of new land added to the acreage of the island of Hawaii when the Puna volcanic eruption of 1955 overflowed the shoreline and extended it. Hereinafter, this new land and similarly created new lands which extend the shoreline are referred to as lava extensions. The disputed lava extension in the instant case lies adjacent to the southerly boundaries of Land Patent Grant No. 4139 (to C.L. Wight) and Land Patent Grant No. 4140 (to H.E. Wilder) in Kehena, Puna, Hawaii, and was created when the 1955 eruption, emanating from an inland source, flowed over the southerly boundaries into the ocean, onto formerly submerged land.

---

[1] The State filed this action on October 3, 1968, pursuant to § 242-1(a), RLH 1955, as amended by Act 258, SLH 1967 § 1.

In December of 1960, the Zimrings obtained a deed from the then owners of Grants 4139 and 4140, which described the lands conveyed, in pertinent part, as follows:

1. All of that certain parcel of land (being all of the land described in and covered by Land Patent Grant Number 4139 to C.L. Wight) situate, lying and being at Kehena in the District of Puna, Island, County and State of Hawaii, and thus bounded and described:

[metes and bounds description of Grant 4139 follows in language identical to that used in the original Land Patent Grant, describing one course as 'along high water mark to end of the 5th course,' and the total area as '64.3 Acres or thereabouts.']

2. All of those certain parcels of land (being all of the lands described in and covered by Land Patent Grant Number 4140 to H. E. Wilder) situate, lying and being at Kehena, in the District of Puna, Island, County and State of Hawaii, and thus bounded and described:

[metes and bounds description of Grant 4140 follows in language identical to that used in the original Land Patent Grant, describing one course as 'along high water mark to end of Second course,' and the total area as '9/10 Acres, a little more or less.']

The conveyances of Grants 4139 and 4140 from W. H. Hill to Herbert C. Shipman in 1944, from Shipman to Francis G. Ruddle in 1959, and from Ruddle to himself, Koshi Miyasaki, Pete Tatsuo Okamoto, Woon Yong Pack and Raymond Y. C. Ho in 1959, were by deeds containing land descriptions identical to that found in the deed the Zimrings received. After receiving the deed, the Zimrings entered upon the disputed lava extension and made improvements thereon which included bulldozing and planting trees and shrubs. In 1968, the State served the Zimrings with a notice and demand to vacate the disputed land and to cease and desist from conducting any further activities thereon. Thereafter, the State filed the instant complaint, joining the Zimrings, their predecessors-in-interest and the predecessors' spouses.

In their answer, the Zimrings denied the State's title. They filed a cross-claim against their predecessors-in-

interest and also filed two counterclaims, both of which were dismissed by the third circuit upon motion by the State. Upon interlocutory appeal by the Zimrings, this court affirmed the dismissal of the first counterclaim, being a claim of title against the State by adverse possession, but reversed the dismissal of the second counterclaim for damages against the State for trespass, disparagement of title, and interference with contract. *State v. Zimring,* 52 Haw. 477, 479 P.2d 205 (1970).

The Zimrings had in the meantime interposed a motion for summary judgment based on the affidavit of William K. Kamau, Sr., a kama'aina witness, who deposed as to his knowledge of Hawaiian usage and custom respecting lava extensions. The trial court granted the Zimring motion, whereupon the State prosecuted its first appeal. In *State v. Zimring,* 52 Haw. 472, 479 P.2d 202 (companion case of *Zimring, supra*), this court reversed the entry of summary judgment, relying on the following grounds: (1) the failure of the Kamau affidavit to comply with H.R.C.P. Rule 56(e); (2) the failure of the affidavit to clearly establish the material fact of the existence or absence of Hawaiian usage; and (3) the inadvisability of relying solely on the kind of affidavit submitted, in a case of first impression on a question of vast public importance.

Upon remand, a motion for separate trials of the complaint, counterclaim and cross-claims made by the Zimrings was granted by the trial court, thereby confining the issue in the first trial to the question whether ownership of the subject lava extension was in the State, the Zimrings, or others.

The State moved for summary judgment, attaching copies of Grants 4139 and 4140 and the deeds in the Zimring chain of title which were offered to show that the disputed area was not included in the deeds and that therefore the Zimrings lacked title. The motion was denied by the trial court and trial commenced.

After trial, in accordance with its Findings of Fact contained in paragraphs numbered one to fourteen, the trial court entered the following conclusions of law:

1. This Court has jurisdiction of the parties and the subject matter of this action.

2. The State has failed to carry its burden of proof to establish its title in the land.

3. Because of the unreasonable delay in pressing its claim, resulting in detriment to Zimrings, and because its actions in its several transactions with Zimrings caused Zimrings to believe that they owned the subject land, as a matter of fundamental fairness, the State is precluded from asserting title to the subject land and denying Zimrings such title.

4. Because Hawaiian usage prior to 1892 gave to the owner of land along the seashore, title to land created by volcanic eruption when the eruption destroyed the pre-existing seashore boundary and formed a new boundary along the sea, Herbert Shipman owned the land formed in 1955 abutting Grants 4139 and 4140.

5. Herbert Shipman's Deed passed title to all of Grants 4139 and 4140, and, by operation of law, to the land formed in 1955, abutting Grants 4139 and 4140. Mr. Ruddle's deed to himself and his associates passed title to the same land. The Deed of Ruddle and associates of December 19, 1960 passed title to the same land. Zimrings thus acquired and now hold title to the land in dispute.

From the judgment entered, the plaintiff State of Hawaii appeals. We turn now to the major issues raised in this appeal.

I

We first examine the question of whether the State, as plaintiff, has, as the circuit court found, failed to carry its burden of proof to establish quiet title in itself to the disputed lava extension.[2] It is well settled in Hawaii that in an action to quiet title the burden is on the plaintiff to prove title in and to the land in dispute, and that absent such proof it is

---

[2] *See* Conclusion of Law No. 2, *supra.*

unnecessary for the defendant to make any showing. *Harrison v. Davis,* 22 Haw. 465, 466 (1915).

In support of its claim to title the State advances the proposition that all private ownership stems from Land Commission Awards, Royal Patents, Land Patents or some document of title issued by the sovereign and that absent such documents, title belongs to the sovereign. A short historical survey is necessary to an understanding of the State's argument.

It was long ago acknowledged that the people of Hawaii are the original owners of all Hawaiian land. The Constitution of 1840, promulgated by King Kamehameha III, states:

> KAMEHAMEHA I, was the founder of the kingdom, and to him belonged all the land from one end of the Islands to the other, though it was not his own private property. *It belonged to the chiefs and the people in common*, of whom Kamehameha I, was the head, and had the management of the landed property.

Fundamental Law of Hawaii (1904) at 3 (emphasis added).

Responding to pressure exerted by foreign residents who sought fee title to land, and goaded by the recognition that the traditional system could not long endure, King Kamehameha III undertook a reformation of the traditional system of land tenure by instituting a regime of private title in the 1840's. In adopting a system under which individuals could hold title to land, the public domain, which theretofore had been all-encompassing, necessarily was diminished.

A Board of Commissioners to Quiet Land Title, commonly known as the Land Commission, was created in 1846 for the "investigation and final ascertainment or rejection of all claims of private individuals," and was empowered to make *Land Commission Awards.* The Minister of Interior was authorized to issue *Royal Patents* upon such awards, upon payment of commutation by the awardee to the government, usually set at one-third the value of the unimproved land at the time of the award.[3] A Land Commission Award furnished

---

[3] L. 1846 at 107; RLH 1925, Vol. II at 2120-3. *See also* J. Chinen, Original Land Titles in Hawaii at 4 (1961).

as good and sufficient a ground upon which to maintain an action against any person as a Royal Patent. Act of August 10, 1854, Laws of Hawaii, 1854; RLH 1925, Vol. II at 2146-7.

In 1847, the King together with the Privy Council determined that a land mahele, or division, was necessary for the prosperity of the Kingdom. The rules adopted to guide such division were, in part, (1) that the King shall retain all his private lands as individual property and (2) that of the remaining lands, one-third was to be set aside for the Government, one-third to the chiefs and konohiki,[4] and one-third for the tenants.[5] The Great Mahele was started in 1848, with the chiefs and konohiki first coming forward to settle their interests by agreement with the King. The Mahele agreements were essentially reciprocal quitclaims and did not convey title. Detailed claims had to be presented to the Land Commission for formal Land Commission Awards.

Once the Mahele agreements with the chiefs and the konohiki had been completed, there was to be a division of the remaining lands between the King and the Government. The King's motives in undertaking such a division were indicated by this court in *Estate of His Majesty Kamehameha IV*, 2 Haw. 715, 722 (1864):

> Even before [the King's] division with the [chiefs and konohiki], a second division between himself and the government or state was clearly contemplated, and he appears to have admitted that the lands he then held might have been subjected to a commutation in favor of the government, in like manner with the lands of the chiefs. The records of the discussion in Council show plainly his Majesty's anxious desire to free his lands from the burden of being considered public domain, and as such, subjected to the danger of confiscation in the event of his islands being seized by any foreign power, and also his wish to enjoy complete control over his own property. Moved by these considerations and by a desire to promote the interest of his Kingdom, he proceeded with an exalted

---

[4] Konohiki in ancient Hawaii were agents of the King or chiefs.

[5] Privy Council Records, Vol. II at 250-308.

liberality to set apart for the use of the government the larger portion of his royal domain, reserving to himself what he deemed a reasonable amount of land as his own estate.

To effect this, the King signed and sealed two instruments. By one instrument, the King, having "set apart forever to the chiefs and people the larger part of my royal land, for the use and benefit of the Hawaiian Government," retained for himself and his heirs certain designated lands, thereafter referred to as Crown Lands. By the second instrument, the King "set apart forever to the chiefs and people of my Kingdom" the remaining designated lands. *Id.* at 723. Until 1865, when Crown Lands were made inalienable,[6] Kamehameha III and his successors acted like private owners respecting such lands. The deeds executed by the King upon sale of any portion of the Crown Lands are known as *Kamehameha Deeds*.

The public domain, which previous to the Mahele had been all-inclusive, was diminished by withdrawals of the Crown Lands and the lands successfully claimed by chiefs, konohiki and tenants. It included, inter alia, the lands surrendered to the Government by the King, the lands ceded by the chiefs in lieu of commutation, the lands purchased by the government, and all lands forfeited by the neglect of claimants to present their claims to the Land Commission within the period fixed by law.[7] In 1893, following the overthrow of the monarchy, the Republic declared that Crown Lands were Government property and part of the public domain.[8]

---

[6] L. 1864 at 69; RLH 1925, Vol. II at 2177-9.

[7] After several extensions, konohiki who failed to obtain awards for designated mahele lands were given until January 1, 1895 to present claims to the Minister of Interior. L. 1892, c. 68; R.L.H. 1925, Vol. II at 2151-2.

[8] Article 95 of the Constitution of July 3, 1894, Fundamental Law of Hawaii at 237 provides:

> That portion of the public domain heretofore known as Crown Land is hereby declared to have been heretofore, and now to be, the property of the Hawaiian Government, and to be now free and clear from any trust of or concerning the same, and from all claim of any nature whatsoever, upon the rents, issues and profits thereof.

As to lands which were overlooked in the Mahele and thus unassigned, the question arose whether they were Crown or Government Lands. This court in *Thurston v. Bishop*, 7 Haw. 421 (1888), adopted the position that such unassigned lands remained part of the public domain.[9]

Following the Mahele, portions of the public domain were sold from time to time in order to provide landless citizens with land and to obtain revenues for public expenditures. Purchasers of these lands were issued documents called *Grants* or *Royal Patent Grants*.

This encapsulation of the origin and development of the private title in Hawaii makes clear the validity of the basic proposition in Hawaiian property law that land in its original state is public land and if not awarded or granted, such land remains in the public domain. To establish legally cognizable private title to land in the great majority of cases, one must show that he or a predecessor-in-interest acquired a Land Commission Award, a Royal Patent, a Kamehameha Deed, a Grant, a Royal Patent Grant, or other government grant for the land in question. *Thurston v. Bishop*, 7 Haw. 421 (1888); *In re Title of Pa Pelekane*, 21 Haw. 175 (1912). Such award or grant can be demonstrated by either the document itself or through the application of the "presumption of a lost grant." *In re Title of Kioloku*, 25 Haw. 357 (1920); *United States v. Fullard-Leo*, 331 U.S. 256 (1947).

Aside from acquisition of documented title, one can also show acquisition of private ownership through operation of

---

[9] Respecting unassigned lands, W. C. Alexander, Surveyor-General of Hawaii from 1870-1901, wrote:

[I]t appears from the record that during the reign of Kamehameha III, [unassigned lands] were treated as Government property, and that many sales from these lands were made by the Government, patents for which were signed by him.

These facts have peculiar weight, as they indicate the views held on this subject by the very parties who executed the original "Mahele", and it must be admitted that Kamehameha III, and the able men who composed his Council and who organized this Government, probably understood their own work better than did those of a later generation.

W. Alexander, Appendix to Surveyor-General's Report: A Brief History of Land Titles in the Hawaiian Kingdom (1882) at 27.

common law or as established by pre-1892 Hawaiian usage pursuant to HRS § 1-1 which reads:

> § 1-1. Common law of the State; exceptions. The common law of England, as ascertained by English and American decisions, is declared to be the common law of the State of Hawaii in all cases, except as otherwise expressly provided by the Constitution or laws of the United States, or by the laws of the State, or fixed by Hawaiian judicial precedent, or established by Hawaiian usage.

Therefore, we find the State's position that all land not awarded or granted remains public land to be basically correct. We would only add that transfer to private ownership can also be shown through the operation of common law or as established by pre-1892 Hawaiian usage.

Since the subject lava extension was created in 1955, there could not be any Land Commission award for it.[10] The record is barren of any evidence that the extension was ever the subject of a government grant. We therefore now turn to the question of whether there is any pre-1892 Hawaiian usage or common law doctrine which establishes private ownership to the extension.

II

Respecting the existence of pre-1892 Hawaiian usage, the trial court concluded that there was traditional usage by which a Zimring predecessor-in-interest acquired the disputed lava extension. See Conclusion of Law No. 4, *supra.*

The trial court recognized that "there is a paucity of evidence in this area [of usage and custom]," (Tr. p. 190), but based its conclusion of usage on Findings of Fact 13 and 14. In Finding of Fact 13, the court found the lava flows of 1868 and 1887 to be relevant to the instant case. These two flows were the only ones between 1846 (when private land ownership originated in Hawaii) and November 1892[11] which created

---

[10] The Land Commission was dissolved in 1854. L. 1854 at 21; RLH 1925, Vol. II at 2146-7.

[11] November 25, 1892 is the date by which ancient Hawaiian usage must have been established in practice. State v. Zimring, 52 Haw. 472, 479 P.2d 202 (1970).

new lava extensions abutting private lands. Regarding the 1868 flow, the court found (emphasis added):

> One flow, that of 1868, added land to a previously granted Land Commission Award, granted in 1854. The evidence showed that the Boundary Commission (1876) and the Royal Patent, issued in 1877, both followed the new shoreline and included newly created land. Both the Boundary Commission and the Royal Patent expressly referred to the 1868 flow. *This is the only documentary evidence offered on Hawaiian usage before 1892.*

. The 1887 flow created a lava extension which abutted the property of C. C. Harris, a private owner. Respecting this, the court found:

> There is no direct evidence of governmental action between 1887 and 1892, but a tax map was introduced which showed that the whole of that land to the post-1887 seashore [*i.e.,* including the lava extension] was still listed as privately owned some 85 years later.

In Finding of Fact 13, the trial judge stated that "the evidence reveals consistent indications, from the nature of ancient Hawaiian land grants under the traditional system, to the usage of State surveys and tax maps into the 1960's, that Hawaiian usage was always to give lava-extended shorelines to the abutting . . . owner."

We hold that the isolated pre-1892 governmental actions cited by the Zimrings are insufficient to establish the asserted usage. There simply were too few lava flows over private oceanfront land between 1846 and 1892 to establish a usage.

Furthermore, there was no evidence adduced at trial as to pre-Mahele practice with respect to new lava extensions. The conjecturing of one counsel as to what the "custom must have been"[12] is not competent. Even assuming that competent evidence had established a traditional usage by which a landholder acquired the right to use lava extensions, such evidence would be of little weight in this case. Under the traditional and more communal economic system in pre-Mahele Hawaii, the ahupua'a were designed to be self-

---

[12] Transcript at 183.

sufficient economic units. Thus, had a practice existed which allowed the landowners the use of lava extensions, such practice would have made good economic sense since denial of access to the ocean and fishing grounds would have rendered the ahupua'a something less than self-sufficient. The economic necessity for such a practice would not have carried over into a private property regime within the framework of a private enterprise economic system. Moreover, the interests a landholder may have enjoyed under the traditional system, within which there was no private title and all land was held in trust for the people by the King, are of little relevance in determining private rights to title under a private property regime.

Tax map treatment of the lava extension created in the 1887 lava flow, relied upon by the trial court to determine usage, indicates only what the tax department assumed about ownership of land. A usage must be based on actual practice, and the drawing of maps and surveys is not tantamount to a practice of awarding or granting title. The tax department is in no position to adjudicate land titles and has no authority to award land or grant land patents. Any assumptions which that department makes or any practices which it follows are no substitute for action by the appropriate governmental body or adjudication by the appropriate tribunal.

Nor can the asserted usage be sustained by reference to government treatment of the lava flow of 1868, which created a lava extension at Pakini Nui, an ahupua'a awarded by name only to Victoria Kamamalu by the Land Commission in 1854 and the subject of Royal Patent No. 4475 in 1861. Pursuant to an 1862 statute which required all persons who had received awards by name only to apply to a Boundary Commission for a determination of their boundaries,[13] the awardee made such application and Commissioner R. A. Lyman determined the boundaries of the ahupua'a of Pakini Nui to include the 1868 lava extension. In 1877 a second Royal Patent was issued with

---

[13] L. 1862 at 27.

a metes and bounds description encompassing the lava extension.[14]

It was the duty of the Boundary Commission to determine the boundaries of awarded land,[15] and it is questionable whether the Commission had the authority to increase an award made by the Land Commission. In the Pakini Nui case, an increase was clearly accomplished since the original 1854 award could not have included a lava extension created eight years later in 1862. The reasons for the inclusion of the extension in Commissioner Lyman's boundary determination do not appear anywhere, and any suggestions as to what they may have been are speculative. However, irrespective of whether such increase was authorized or not and the reasons therefor, the issuance of the second Royal Patent in 1877 served as a quitclaim of the interest of the government in the lava extension[16] and now serves as the basis for private title in the extension.

In this case, however, there is no Royal Patent covering the lava extension in question and we do not find that the government's sole act of quitclaiming its interest in the Pakini Nui lava extension sufficient to give rise to a usage. Our hesitancy to rely upon a single act to establish usage is reinforced in this case by the absence of any evidence as to the reasons for that act.

We agree with the trial court that there is a paucity of evidence establishing usage and moreover find such paucity fatal. We do not find substantial evidence that "Hawaii usage prior to 1892 gave to the owner of the land along the seashore, title to land created by volcanic eruption when the eruption destroyed the pre-existing seashore boundary and formed a new boundary along the sea . . . ."[17] Reversing the trial court in its finding of usage, we turn to whether the common law establishes private ownership of lava extensions.

---

[14] Greenwell v. Paris, 6 Haw. 315 (1882), established the principle that a second patent might be issued on land already patented when the original patent did not contain a metes and bounds description.

[15] L. 1862 at 27-8.

[16] Mist v. Kawelo, 11 Haw. 587, 589 (1898).

[17] Conclusion of Law No. 4.

III

No court sitting at common law has had occasion to deal with the question of lava extensions. We understand this case to be one of first impression and are mindful of its potential impact. The decision is one which will count for the future. In surveying the common law, the only doctrines which are even of conceivable application are those of accretion and avulsion. We agree with the appellees' statement in the proceedings below that "the common law on accretion and avulsion in other states is not directly on point." However, the appellees contend that the "logic of cases based on these concepts would lead to the rule that volcanic additions on the Island of Hawaii go to the abutting owner." We disagree.

As known at common law, "the term 'accretion' denotes the process by which the area of owned land is increased by the gradual deposit of soil due to the action of a bounding river, stream, lake, pond, or tidal waters." 7 R. Powell, Real Property (1976) ¶ 983. When accretion is found, the owner of the contiguous land takes title to the accreted land. *Halstead v. Gay,* 7 Haw. 587, 588 (1889). Professor Powell indicates that the "basic justification for a doctrine which permits a boundary to follow the changing stream bank is the desirability of keeping land riparian which was riparian under earlier facts, thus assuring the upland owners access to the water and the advantages of this contiguity." *Id.*

While the accretion doctrine is founded on the public policy that littoral access should be preserved where possible, the law in other jurisdictions makes it clear that the preservation of littoral access is not sacrosanct and must sometimes defer to other interests and considerations. For example, it is well established in California "that accretions formed gradually and imperceptibly, but caused entirely by artificial means . . . belong to the state or its grantee, and do not belong to the upland owner." *Carpenter v. City of Santa Monica,* 63 Cal. App. 2d 772, 794, 147 P.2d 964, 975 (1944); *People v. Hecker,* 179 Cal. App.2d 823, 4 Cal. Rptr. 334 (1960). In California it is also well settled that being cut off from contact with the sea is not basis for proper complaint. In

*Los Angeles Athletic Club v. Santa Monica,* 63 Cal. App.2d 795, 799, 147 P.2d 976, 978 (1944), a companion case to *Carpenter, supra,* the court noted (citations omitted):

> It is well settled that the littoral rights of an upland owner who owns no title to tidelands adjoining his property are subject to termination by whatever disposition of tidelands the state, or its grantees, in the exercise of their trust, choose to make.''

Likewise, in cases where there have been rapid, easily perceived and sometimes violent shifts of land (avulsion) incident to floods, storms or channel breakthroughs, preexisting legal boundaries are retained notwithstanding the fact that former riparian owners may have lost their access to the water. *Garrett v. State,* 118 N.J. Sup. 594, 601, 289 A.2d 542, 546 (1972). *See also Nebraska v. Iowa,* 143 U.S. 359 (1892).

In determining in whom lava extensions should vest, we are guided by equitable principles and must balance between competing interests. On the one hand, there is the interest of the former littoral owner seeking to regain access to the ocean. On the other hand is the interest of the public at large, the original and ultimate owner of all Hawaiian land.

Certainly, a grant of the lava extension to the former littoral owner would compensate him for the loss of the beach-frontage character of his property. However, it is the windfall of the added acreage which such owner would also be afforded which this court finds troublesome. If a one-third acre parcel fronting the ocean is flowed over by lava which adds one or two seaward acres to the parcel, is it equitable that its owner acquire property which is three or six times the size of the preexisting parcel? If a littoral owner is to be thus compensated for lava devastation, should not an upland pasture or farm owner be also compensated with pasture or farm land for the destruction of what had been the chief economic attribute of his parcel?

It is impossible for any court to fashion a legal doctrine which will equitably compensate all victims of lava devastation. This court believes that it is within the province of the

legislature to determine the nature and extent of compensation for such natural disasters.

Rather than allowing only a few of the many lava victims the windfall of lava extensions, this court believes that equity and sound public policy demand that such land inure to the benefit of all the people of Hawaii, in whose behalf the government acts as trustee. Given the paucity of land in our island state and the concentration of private ownership in relatively few citizens, a policy enriching only a few would be unwise. Thus we hold that lava extensions vest when created in the people of Hawaii, held in public trust by the government for the benefit, use and enjoyment of all the people.

Under public trust principles,[18] the State as trustee has the duty to protect and maintain the trust property and regulate its use. Presumptively, this duty is to be implemented by devoting the land to actual public uses, e.g., recreation. Sale of the property would be permissible only where the sale promotes a valid public purpose.

While the Zimrings cannot be granted the private beachfront title which they seek, they, as members of the public, would share in public access to the lava extension and to the ocean, unless the interest in allowing public access is outweighed by some other public interest, or unless the land is sold in furtherance of the public interest.

IV

The appellees argue as a separate and independent ground for dismissing the State's claim that the State failed to show how it acquired a claim to the disputed lava extension from the federal government. In response to the State's argument that the federal government ceded the disputed land to the new state in the Admission Act,[19] the appellees

---

[18] See generally Illinois Central R.R. v. Illinois, 146 U.S. 387 (1892); King v. Oahu Ry. & Land Co., 11 Haw. 717 (1899).

Cf. the discussion infra of the public trust expressly imposed on "public lands" by the Hawaii Admission [Statehood] Act.

[19] Act of March 18, 1959, Pub. L. 86-3, 73 Stat. 4.

argue that the only federal public lands which passed to the State were lands ceded to the United States by the Republic of Hawaii in 1898. Since the subject land was created in 1955, they argue that it could not have been part of "ceded lands" and therefore, was not conveyed to the State pursuant to the Admission Act.

Section 5(b) of the Admission Act reads:

Except as provided in subsection (c) and (d) of this section, the United States grants to the State of Hawaii, effective upon its admission into the Union, the United States' title to all the public lands and other public property within the boundaries of the State of Hawaii, title to which is held by the United States immediately prior to its admission into the Union . . . .

Section 5(g) of the Act indicates that "'public lands and other public property' means, and is limited to, the lands and properties that were ceded to the United States by the Republic of Hawaii under the joint resolution of annexation . . . or that have been acquired in exchange for lands and properties so ceded."

According to the Joint Resolution of Annexation, the Republic ceded to the United States

all rights of sovereignty of whatsoever kind in and over the Hawaiian Islands and their dependencies, and also . . . the absolute fee and ownership of all public, Government, or Crown lands, public buildings or edifices, ports, harbors, military equipment and *all other public property of every kind and description belonging to the Government of the Hawaiian Islands, together with every right and appurtenance thereunto appertaining.*[20]

We do not read "property . . . with every right and appurtenance thereunto appertaining," as narrowly as do the appellees. It is well known that the term "property" is extremely broad. Without limiting adjectives or other qualifications, the term includes property which is real, personal and mixed, choate and inchoate, corporeal or

---

[20] Resolution No. 55 of July 7, 1898 (Newlands Resolution), 30 Stat. 750 (emphasis added).

incorporeal. *Hunt v. Authier,* 169 P.2d 913, 917 (9th Cir. 1946). The U. S. Supreme Court in interpreting the treaty by which Louisiana was acquired stated that "[t]he term 'property' as applied, comprehends every species of title inchoate or complete." *Soulard v. United States,* 29 U.S. (4 Peters) 511 (1830).

As a sovereign and independent power and as successor to the Kingdom of Hawaii, the Republic had an interest in any lands to be added to the Territory of the Hawaiian Islands, whether through conquest, discovery, or volcanic activity. Such an interest was recognized in Article 15 of the Republic's Constitution, which stated:

> The Territory of the Republic of Hawaii shall be that heretofore constituting the Kingdom of the Hawaiian Islands, and the territory ruled over by the Provisional Government of Hawaii, or which may hereafter be added to the Republic.[21]

Since the cession was completely voluntary, pursuant to the "expressed desire of the government of the Republic of Hawaii,"[22] the Republic could have ceded something less than all of its property rights and interests, retaining, for example, all public land on the Island of Hawaii and all rights to lava extensions thereafter created. However, the Republic chose to cede and voluntarily quitclaim all of its property interests including its right to, and interest in, any future lava extensions. Since the right to future lava extensions was conveyed to the United States at the time of annexation, any lava extension thereafter created should be considered to be among the "lands and properties that were ceded to the United States by the Republic of Hawaii under the joint resolution of annexation."[23] Such land passed to the State of Hawaii pursuant to Section 5(b) of the Admission Act. The State thus obtained title to the disputed lava extension upon admission in 1959.

---

[21] Constitution of July 3, 1894, in Civ. L. 1897 at 5.

[22] Preamble to the Treaty of Annexation of 1897, quoted in the Resolution of the Senate of Hawaii Ratifying the Treaty of Annexation, RLH 1905, at 40.

[23] Admission Act, § 5(g).

A conclusion that the parcel in question was not conveyed to the State upon admission would be inconsistent with our understanding of congressional intent underlying the land conveyance provisions of the Admission Act. The complex provisions of Section 5 of the Act are indicative of a congressional purpose to convey to the State all public properties not necessary for the uses and purposes of the United States. The federal government has always recognized the people of Hawaii as the equitable owners of all public lands; and while Hawaii was a territory, the federal government held such lands in "special trust"[24] for the benefit of the people of Hawaii. Thus the Joint Resolution of Annexation provided in substance, that the existing laws of the United States governing public lands should not apply to Hawaii, that special laws should be enacted for the management and disposition of such property, and that the income derived from it should be used "solely for the benefit of the inhabitants of the Hawaiian Islands for educational and other public purposes," except respecting such property "as may be used or occupied for the civil, military or naval purposes of the United States."[25] In the Hawaii Organic Act, in enacting special laws for the management and disposition of public lands, Congress provided that the United States would have no more than naked title to the public lands other than those set aside for federal uses and purposes. The Organic Act provided:

> Sec. 91. That the public property ceded and transferred to the United States by the Republic of Hawaii under the joint resolution of annexation, approved July seventh,

---

[24] Such a special trust was recognized by the Attorney General of the United States, in 22 Op. Atty. Gen. 574 (1899).

[25] Joint Resolution of July 7, 1898 30 Stat. 750, 48 U.S.C. 661:

The existing laws of the United States relative to public lands shall not apply to such lands in the Hawaiian Islands; but the Congress of the United States shall enact special laws for their management and disposition: *Provided,* That all revenue from or proceeds of the same, except as regards such part thereof as may be used or occupied for the civil, military, or naval purposes of the United States, or may be assigned for the use of the local government, shall be used solely for the benefit of the inhabitants of the Hawaiian Islands for educational and other public purposes.

eighteen hundred and ninety-eight, *shall be and remain in the possession, use, and control of the government of the Territory of Hawaii, and shall be maintained, managed, and cared for by it, at its own expense, until* otherwise provided for by Congress, or *taken for the uses and purposes of the United States* by direction of the President or of the governor of Hawaii.[26]

The beneficial ownership of the people of Hawaii was again acknowledged in the Admission Act, wherein Congress provided that the public lands conveyed to the State upon admission "shall be held by said State as a *public trust* for the support of the public schools and other public institutions, for the betterment of the conditions of native Hawaiians . . . for the development of farm and home ownership on as widespread a basis as possible, for the making of public improvements, and for the provisions of lands for public use."[27]

The conveyance of public lands to the State upon admission was subject to the reservation in the Admission Act that any public lands "set aside" for federal use by act of Congress or by order of the President or the governor of Hawaii prior to Statehood or within five years from admission would remain federal property.[28] It is not disputed, however, that the subject lava extension has never been "set aside" for federal uses and purposes and that the federal government has never indicated any interest therein.

Excepting lands set aside for federal purposes, the equitable ownership of the subject parcel and other public land in Hawaii has always been in its people. Upon admission, trusteeship to such lands was transferred to the State, and the subject land has remained in public trust since that time.

---

[26] Act of April 30, 1900, 31 Stat. 141 (emphasis added).

[27] § 5(f) (emphasis added).

[28] §§ 5(b) and (c). *See* Senate Rep. No. 80, 86th Cong., 1st Sess., U.S. Code Cong. & Ad. News, 1346, 1362 (1959).

V

Another issue is whether the State is estopped from asserting its claim to title in this action. This court has stated that "the doctrine of equitable estoppel is fully applicable against the government if it is necessary to invoke it to prevent manifest injustice." *Yamada v. Natural Disaster Claims Commission*, 54 Haw. 621, 629, 513 P.2d 1001, 1006 (1973).

The trial court, in Findings of Fact Nos. 4 through 12, determined that the following supported estoppel against the State: that on several occasions beginning in May, 1961, the Zimrings informed the State of their belief that they owned the subject lava extension; that on October 23, 1961 the Zimrings and the State executed a mutual deed relating to easements on Grants 4139 and 4140, and that the State did not indicate its claim to the lava extension at that time or during prior negotiations; that the State assessed, and the Zimrings paid, taxes on a parcel that included the subject land; that on September 9, 1964, when the Zimrings and State executed deeds respecting the location of the government road, the State did not indicate a claim to the disputed land; that the Zimrings first learned of the State's interest in a newspaper article published on May 12, 1965 in the Hawaii Tribune-Herald; and that the State did not make a formal claim until August, 1968.

We note that the record does not support Finding of Fact No. 4 that the Zimrings informed the State of their belief of ownership of the lava extension as early as May, 1961. At that time, the Zimrings merely presented to the State a Certificate of Title and a Continuation which certified title to "that certain parcel of land (being all of the land described in and covered by Land Patent Grant No. 4139 to C.L. Wight)" and "those certain parcels of land (being all of the lands described in and covered by Land Patent Grant No. 4140 to H.E. Wilder)." The Certificate of Title, which the Attorney General found satisfactory, does not indicate any claim to the lava extension abutting Grants 4139 and 4140 and as we discussed in Part III above, the lava extension did not

become part of the Grants through operation of law. Similarly, both the deeds relating to the easements and the roadway contain acknowledgment of Zimring ownership "of lands described in Grant 4139 to C.L. Wight, and 4140 to H.E. Wilder" but fail to state that Grants 4139 and 4140 include the lava extension created in 1955, some fifty-seven years after the grants were awarded.

While the evidence does indicate that the Zimrings were assessed, and paid, taxes on the subject parcel since 1961, the collection of taxes on land does not necessarily estop a government from asserting a claim to land. *Halvorsen v. Pacific County*, 22 Wash.2d 532, 156 P.2d 907 (1945); *Gulf Oil Corp. v. State Mineral Board*, 291 So.2d 807 (La. App. 1974); *International Paper Co. v. Mississippi State Highway*, 271 So.2d 395 (Miss. 1973); *Dunnick v. Stockgrowers Bank of Marmouth*, 191 Neb. 370, 215 N.W.2d 93 (1974). In the instant case, the tax department acted beyond its authority in imposing a tax upon private individuals for public land. It is well settled that "estoppel will not be applied where the officials on whose conduct or acts it is sought to be predicated acted wholly beyond their power and authority . . . ." 28 Am. Jur. 2d, Estoppel and Waiver § 122; *Farrow v. Charleston*, 169 S.C. 373, 168 S.E. 852 (1933); *Petty v. Borg*, 106 Utah 524, 150 P.2d 776 (1944); *accord, Godbold v. Manibog*, 36 Haw. 206 (1942).

The State did not inform the Zimrings of its claim to the disputed parcel until 1968, some seven years after the Zimrings had purchased Grants 4139 and 4140. However, "[m]ere silence does not create estoppel unless there was some obligation to speak or duty to speak . . . ." *Peabody v. Damon*, 16 Haw. 447, 455 (1905); *Broida v. Hayashi*, 51 Haw. 493, 500, 464 P.2d 285, 290 (1970); 31 C.J.S., Estoppel § 87; 28 Am. Jur.2d, Estoppel and Waiver § 53. In the instant case, the question of title to the subject lava extension was not raised in communications between the parties before 1968; there was no assertion of title or institution of legal action to clear title on the part of either party before 1968. We find, therefore, that there was no obligation or duty to speak on the part of the State before this action was initiated. We are not

persuaded that the bulldozing of, and the planting of trees and shrubs on the subject land, in the absence of evidence of knowledge and consent of the State, is sufficient to give rise to an obligation to speak.

We are also of the opinion that the combination of the collection of taxes on, and silence with respect to a claim for the subject land does not estop the State. *International Paper Co. v. Mississippi State Highway Department, supra; Gulf Oil Corp. v. State Mineral Board, supra.*

Furthermore, we do not find *Yamada, supra* and *City of Long Beach v. Mansell,* 3 Cal. 3d 462, 476 P.2d 423 (1970), which the Zimrings cite, to be controlling in the instant case. In those cases, the extent of government involvement and participation and private owner reliance was extensive, resulting in manifest injustice. There was no manifest injustice here. We therefore hold, on the facts of this particular case, that the State is not estopped from asserting its claim to the subject parcel. Given the disposition of this appeal, we find it unnecessary to consider the State's specifications that the trial court erred in denying its motion for summary judgment and in granting the Zimrings' motion for separate trial.

In conclusion, the subject lava extension when created was public domain, and there is no indication that pursuant to Government grant, operation of common law, or Hawaiian usage, such land ever left public hands. Title to the land passed to the State from the federal government pursuant to the Admission Act.

In view of the foregoing, we find that the trial court erred in not quieting title in the State and further erred in granting title to the Zimrings. We reverse and remand for entry of judgment in accordance with this opinion.

*Andrew S. O. Lee and Edwin Watson,* Deputy Attorneys General, for plaintiff-appellant.

*Franklin E. Zimring (Molly D. Zimring* with him on the briefs) for defendants-appellees.

*Ivan M. Lui-Kwan (Carlsmith Carlsmith Wichman & Case,* of counsel) for Herbert C. Shipman et al.

DISSENTING OPINION OF VITOUSEK,
CIRCUIT JUDGE

This appeal involves the question of whether the State of Hawaii or the defendants-appellees/private landowners, are entitled to ownership of approximately 7.9 acres of land created by the Puna volcanic eruption of 1955. This new land was created as the 1955 'a'a flow overran the ocean front property of appellees' predecessors in title and flowed into the sea. The majority has decided that title to the new lava extension is in the State of Hawaii and that the appellees are without interest in this land (apart from their interest as members of the public).

The appellees purchased their properties[1] in 1960 from Francis G. Ruddle, Koshi Miyasaki, Pete Tatsuo Okamoto, Woon Yong Pack and Raymond Y. C. Ho receiving a general warranty deed which contained the same description of the property as found in both the August 31, 1959 deed which Francis Ruddle received from Herbert Shipman and the December 19, 1944 deed received by Herbert Shipman from W. C. Hill. Each deed described the makai (and at that time seaward) boundary of the parcels as "along the high water mark". The 1955 flow extended this shoreline a considerable distance and in so doing added the 7.9 acres of land that are the subject of this appeal. The appellees entered upon this newly formed land and, believing they owned it, made substantial improvements thereon.

This action commenced in 1968, 13 years after the land was created, as the State served notice on the appellees to vacate the disputed land and then instituted this action to quiet title in the State.

It should be noted at the outset that in an action to quiet title (pursuant to § 2421(a) RLH 1955 as amended by Act 258 SLH 1967 § 1, now HRS 669-1(a)) "it is incumbent upon the *plaintiff* to prove a title in or to the land in dispute, and, if he fails to do so, it will be unnecessary for the defendant to make

---

[1] Consisting of two parcels; Land Patent Grant 4140 to H. E. Wilder and Land Patent Grant No. 4139 to C. L. Wight, both situated in Kehena, Puna, Hawaii.

any showing." *Harrison v. Davis*, 22 Haw. 465, 466 (1915) (emphasis added). Thus the State of Hawaii, to meet its burden of proof, must prove to the trial court's satisfaction that it had valid title to the land in dispute. After trial in the Circuit Court of the Third Circuit, the trial judge issued the following findings of fact and conclusions of law:

*FINDINGS OF FACT*

1. In April of 1955, a flow of volcanic lava destroyed the old seashore boundary and created a new seashore boundary and approximately 7.9 acres of new land abutting the land described in Grants 4139 to C. L. Wight and 4140 to H. E. Wilder, in Kehena, Puna, Island of Hawaii, then owned by Herbert Shipman. This new land is herein sometimes referred to as the subject land.

2. On August 31, 1959, Herbert Shipman executed a Deed to Francis Ruddle of Grants 4139 and 4140, describing the lands as bounded at the south, as follows: (a) Land Patent Grant No. 4139, "15. S. 45° 42' E. 82 ft. along Sec. 5 Lot 2, to mark + at sea bluff and along same line of (sic) high water mark," and "19. S. 23° 10' E. 240 ft. a little more or less to high water mark. Thence along high water mark to end of 5th (sic) course . . ." (b) Land Patent Grant No. 4140, section 5 Lot 2, "S. 21° 41' E. 130 ft. more or less along Government land to high water mark. From initial point again the boundary runs: S. 45° 42' E. 82 ft. to rock marked + at sea bluff and along same line to high water mark. Thence along high water mark to end of Second course." Mr. Ruddle subsequently deeded the lands by the same description to himself and four others on September 21, 1959.

3. On December 16, 1960, Mr. Ruddle and his associates deeded the property, with the same description, to Zimrings. In December of 1960, Zimrings took possession of the land.

4. On several occasions, beginning in May of 1961, the State Department of Land and Natural Resources and the Office of the Attorney General of the State were

informed that Zimrings believed they were owners of the land abutting Grants 4139 and 4140 to the then existing high water mark.

5. On October 23, 1961, the State and Zimrings entered into a mutual deed, drafted by the State, to settle a matter relating to easements on Grants 4139 and 4140. The deed recited that Zimrings were owners of the parcels to high water mark, using the same description. Attached to that deed was a sketch of the lands added by the 1955 flow. To the left and right of the parcel now in dispute were new lands abutting old Government lands. These new lands were labeled "Government land"; the land now in dispute was clearly set off from these parcels and was not labeled Government land. The State should have had knowledge, before the deed was drafted and executed, of the addition of the land now in dispute. The State gained an easement in this transaction, but remained silent on any claims it had. Prior to that time, the Attorney General of the State had examined Zimrings' Certificate of Title, which contained a description to a seashore boundary, and declared it to be satisfactory.

6. From 1961 onward, Zimrings were assessed taxes by the State on a parcel including the subject land and paid these taxes, believing they were lawful owners of the subject land.

7. In December of 1961, Zimrings paid off the mortgage owned on Grants 4139 and 4140. From 1961 through 1965, Zimrings planted trees and shrubs on the land and had the subject land bulldozed, believing there were no claims adverse to theirs in the subject land and relying on the recitations in the deed of 1961.

8. On September 9, 1964, the State and Zimrings executed two other deeds, drafted by the State, to settle roadway disputes arising from the change in the Kaimu-Opihikao road occasioned by the 1955 lava flow. Both deeds recited that Zimrings were the owners of Grants 4139 and 4140, and attached to each were sketches identical to that described in Finding of Fact No.

5. The State gave no indication of any claim to the subject land. The State received a grant of land in one of these deeds.

9. The State's failure to assert any claim in the transactions described in Findings of Fact Nos. 5, 6 and 8, and the recitations of ownership in the 1961 and 1964 deeds, are inconsistent with the State's claim of ownership to the subject land.

10. Zimrings were not aware of any possibility of a claim by the State to the subject land until May 12, 1965, when a newspaper article concerning the State's interest in lava lands formed in 1960 was published in the Hawaii Tribune-Herald.

11. After publication of that newspaper article, Zimrings sought but could not secure information from the State Department of Land and Natural Resources on its claims or intentions. It was not until August of 1968 that Zimrings were informed of the State's claims.

12. The seven-year delay in pursuing a claim to the subject land, after notice of Zimring claim, was unreasonable.

13. Hawaiian usage, prior to 1892, was to give to the owner of land along a seashore, title to land created by volcanic eruption, when the eruption destroyed the preexisting seashore boundary and formed a new boundary along the sea. The evidence established that in the period between 1800 and the present time there were 13 lava flows that added land area to the seashore. Of these 13, only three occurred between 1846, when private land ownership originated in Hawaii, and November of 1892. It was established that two of these flows crossed private seashore land and added new land. One flow, that of 1868, added land to a previously granted Land Commission Award, granted in 1854. The evidence showed that the Boundary Commission (1876) and the Royal Patent, issued in 1877, both followed the new shoreline and included newly created land. Both the Boundary Commission and the Royal Patent expressly referred to the 1868 flow. This is the only documentary

evidence offered on Hawaiian usage before 1892. The second flow over private seashore land, that of 1887, occurred just five years before 1892. The evidence showed that there was a previous Royal Patent to C. C. Harris, issued in 1861, covering the old seashore boundary. There is no direct evidence of governmental action between 1887 and 1892, but a tax map was introduced which showed that the whole of that land to the post-1887 seashore was still listed as privately owned some 85 years later. No testimony based on personal knowledge of pre-1892 Hawaiian usage was offered, and there is no evidence of contrary Hawaiian usage.

14. To the same effect as Finding No. 13, but of less direct impact, the evidence reveals consistent indications, from the nature of ancient Hawaiian land grants under the traditional system, to the usage of State surveys and tax maps into the 1960's, that Hawaiian usage was always to give lava-extended shorelines to the abutting seashore owner. It was not until the mid-1960's that any contrary claims were made by the State.

### CONCLUSIONS OF LAW

From the foregoing, the Court makes the following Conclusions of Law:

1. This Court has jurisdiction of the parties and the subject matter of this action.

2. The State has failed to carry its burden of proof to establish its title in the land.

3. Because of the unreasonable delay in pressing its claim, resulting in detriment to Zimrings, and because its actions in its several transactions with Zimrings caused Zimrings to believe that they owned the subject land, as a matter of fundamental fairness, the State is precluded from asserting title to the subject land and denying Zimrings such title.

4. Because Hawaiian usage prior to 1892 gave to the

owner of land along the seashore, title to land created by volcanic eruption when the eruption destroyed the preexisting seashore boundary and formed a new boundary along the sea, Herbert Shipman owned the land formed in 1955 abutting Grants 4139 and 4140.

5. Herbert Shipman's Deed passed title to all of Grants 4139 and 4140, and, by operation of law, to the land formed in 1955, abutting Grants 4139 and 4140. Mr. Ruddle's Deed to himself and his associates passed title to the same land. The Deed of Ruddle and associates of December 19, 1960 passed title to the same land. Zimrings thus acquired and now hold title to the land in dispute.

It is my belief that the Findings of Fact are well supported by the evidence and not clearly erroneous (HRCP 52 (a)) and that the Conclusions of Law set out by the trial judge reflect a correct reading of the law in light of the facts proved. Therefore I must respectfully dissent from the majority's holding to the contrary.

Specifically, I believe the trial court was correct in concluding:

1. that the State failed to carry its burden of proof to establish its title to the land;

2. that there was competent evidence adduced as to a custom or usage existent prior to 1892 which would give to the upland landowner additions to his property caused by lava flows and that such custom should control the outcome of this action;

3. that the State, by its actions in several transactions with the appellees, knowing that they claimed ownership of the subject lands, and by the consistent actions of the governments of Hawaii since 1868 recognizing ownership of lava extensions by the upland abutting landowners, is now estopped from challenging appellees' title.

I further conclude (in response to aspects of the majority decision not based on issues briefed by the parties or dealt with by the trial court,)

4. that the majority, having concluded that the title they

find in the State must of necessity[2] be derived from federal title, erred in failing to consider whether federal law is relevant and perhaps controlling, and

5. that the majority erred in its conception of public policy.

As stated before, in this action to Quiet Title the State, as plaintiff, must carry the burden of proof. The State must show how title devolved to the State, or more specifically, why title to newly created lava extensions vests in the State and does not attach to the abutting land as the lava itself did. The State sought to dispose of this burden by showing, and the majority decided: (A) that, as a general proposition, all land not awarded or granted is public land; (B) that the subject land did not become a part of the appellees' land through custom and usage; (C) that the subject land did not become part of the appellees' land by operation of common law; and (D) (as an additional link in the State's chain of title not expounded by the State's Attorney General but supplied by the majority,) that one element of the inchoate rights pertaining to public property is the right to ownership of new land added by lava extensions to preexisting seashore boundaries, that such inchoate rights were ceded by the Republic of Hawaii to the United States in 1898, and the land thus created in 1955 constituted a maturing of these inchoate rights, which newly-created land was then ceded back to the State of Hawaii in 1959 by the Admission Act.

### I. THE STATE FAILED TO CARRY ITS BURDEN OF PROOF TO ESTABLISH ITS TITLE TO THE LAND

A.    The court decided that all land not awarded or granted is public land, but the cited cases do not support this contention.

---

[2] The State of Hawaii came into existence in 1959. See the Admission Act of March 18, 1959, Pub. L. 86-3 73 Stat. 4. Prior to that time sovereignty over the Islands was in the United States Government and the Government of the Territory of Hawaii. See Organic Act (Act of April 30, 1900 C339, 31 Stat. 141).

The majority, in adopting the State's first contention, finds as a basic proposition of Hawaiian land law that land in its original state[3] is public land and if not awarded or granted remains in the public domain. Their support for this proposition is drawn from decisions of the Hawaii Supreme Court between 1875 and 1912 dealing with ownership of lands to which a Mahele agreement had been where the claimant had failed to perfect this title before the Land Commission. This court held that the failure to present claims to the Land Commission before the termination of the statutory limitations period (which originally was to end February 14, 1848 but was extended by statute)[4] rendered such claims invalid. *Thurston v. Bishop,* 7 Haw. 421 (1889); *Kenoa v. Meek,* 6 Haw. 63 (1871); *Dowsett v. Maukeala et al.,* 10 Haw. 166 (1895); *Kaai v. Mahuka,* 5 Haw. 354 (1885); *In Re Title to Pa Pelekane,* 21 Haw. 175 (1912); *Kahoomana v. Minister of Interior,* 3 Haw. 635 (1875). At the heart of these decisions was this court's interpretation of Section 8 of the Act of 1845[5] which provided:

> All claims to land, as against the Hawaiian Government, which are not presented to said Board (Land Commission) within the time, at the place and in the manner prescribed in the notice required to be given by the fifth section of this article, shall be deemed invalid, and shall be forever barred in law unless the claimant be absent from the Kingdom and have no representative therein.

The court decided that this bar was absolute unless the claimant fit within the statutory exceptions.

The question then arose as to whether these unassigned lands were Crown Lands or Government Lands. In deciding that the Government had title to unassigned lands, the court

---

[3] It is unclear what "original state" means in this context. If it means "undeveloped" it is a mischaracterization of the facts.

[4] *See* Laws of Hawaii, 1847; RLH 1925, Vol. II, p. 2137 and Laws of Hawaii, 1854, p. 25, RLH 1925, Vol. II, p. 2147 (Extension of Time).

[5] Passed Dec. 10, 1845 — Statutes of 1846, Vol. I, p. 107. *See* Kahoomana v. Minister of Interior, 3 Haw. 635, 636-7 (1875).

examined and reexamined the events surrounding the Great Mahele. See *Kenoa v. Meek,* 6 Haw. 63, 64-66; *Kahoomana v. Minister of Interior,* 3 Haw. 635, 638-639; *Thurston v. Bishop,* 7 Haw. 421, 428-434. Of particular import was the declaration of Kamehameha III on March 8, 1848 by which he ceded a large measure of the land of his Kingdom to the Hawaiian Government. This instrument, written in Hawaiian but translated into English by this court in *In Re Estate of His Majesty Kamehameha III,* 2 Haw. 715 (1864) states:

> Know all men by these presents, that I, Kamehameha III, by the Grace of God, King of these Hawaiian Islands, have given this day of my own free will and have made over and set apart forever to the chiefs and people the larger part of my royal land, for the use and benefit of the Hawaiian Government, therefore by this instrument I hereby retain (or reserve) for myself and for my heirs and successors forever, my lands inscribed at pages ... these lands are set apart for myself and for my heirs and successors forever, as my own property exclusively.

This proclamation evidenced the King's intent that all lands not specifically reserved for the crown or claimed by the Konohiki or others through the Land Commission process be set apart for the use of the Government. This intent also found expression in the "Principles Adopted by the Board of Commission to Quiet Land Titles" (RLH 1925, Vol. II, p. 2120-2152). These Principles, enacted by the Legislative Council on Oct. 26, 1846, were intended to guide the Land Commission in its adjudication of land claims. The Principles close with this statement:

> The titles of all lands, whether rightfully or wrongfully claimed, either by natives or foreigners, in the entire Kingdom, which shall not have been presented to this Board for adjudication, conformation, or rejection, on or before the 14th day of February, 1848, *are declared to belong to the Government* by section 8 of the article creating this Board. Parties who thus neglect to present their claims, do so in defiance of the law, and cannot complain of the effect of their disobedience (emphasis added).

Principles, in Statutes of 1846, Vol. 2, p. 93; *Kahoomana v. Minister of Interior,* 3 Haw. at 639 (1875) and *Thurston v. Bishop,* 7 Haw. at 432 (1888).

In its consideration of the above cited cases, the court was engaged in narrow statutory analysis[6] and not in announcement of a fundamental proposition of Hawaiian land law. Nor did the statutes being interpreted announce any principle of law which would have application to lands created *after* their enactment. The Government's title to unassigned lands which were the subject of the cases cited above is derived directly from a Grant from the King. The Government received all the land not reserved by the King or successfully claimed by other individuals before the Land Commission. There is a fundamental difference between the proposition that the scope of the grant to the Government from its predecessor in title, the King, included all lands not reserved or claimed, and the proposition announced by the majority that the Government owns all lands, *whenever created,* to which there is no Land Commission Award, Royal Patent, Kamehameha Deed or other Government grant. The former proposition is supported by precedent and logic, whereas the latter is without precedent, as no Hawaiian case or statute, past or present, has been cited or discovered which even mentioned lands to be created in the future.

It is a logical assumption that the engineers of the Great Mahele, aware of the fact of volcanic eruptions, were confident that any additions to the islands created thereby would be dealt with in a manner consistent with existing custom and usage and the principles of the recently embraced common law.

---

[6] "It must be remembered that these 'Principles', however much they may be criticized at the present day were Statutory Law." *Thurston v. Bishop,* 7 Haw. at 431. The "Principles" were tested in *Thurston, supra,* against the Constitution of 1840 or the Act of 1839 (Declaration of Rights) which said "Nothing whatever shall be taken from any individual except by express provisions of the laws."

The court found the principles to be a valid law and section 8 thereof to be a general statute of limitations, thus "the express provisions of the law" deprived the complainant of his right to present his claim due to his failure to do so in a timely manner. The court said "We fail to see how the letter or spirit of the Constitution of 1840 is violated by the Act of 1845," *Thurston, id* at 433.

Certainly it is beyond dispute that persons who did receive either a Royal Patent, a Kamehameha Deed, a Land Commission, or other such Grant received a fee simple interest in the lands therein described.[7] With fee simple ownership the grantee or successful claimant became entitled to all the incidents and privileges which attach to that status by operation of the common law or Hawaiian custom and usage. In the instant case the appellees contend that one incident of ownership, derived both from custom and common law, is the right to take title to accessions to property including those caused by lava. I believe there is merit in these contentions.

B.    The majority decides that the subject land did not become part of appellees' land through operation of common law principles. However, it is my belief that two separate and distinct common law principles, (1) the law of accretion, and (2) the principles developed to guide the construction of conveyances, are relevant to the instant case and favor the appellees' position.

1. Accretion. The common law of accretion and avulsion does not necessarily directly control the case now before us, yet this does not mean that it is without import. If this is a decision which will count for the future, it should be undertaken with careful consideration of the past, both the policies from which the common law doctrines governing ownership of additions to land were derived and developed, and unique Hawaiian usage. These common law policies and Hawaiian usage coalesce to give the abutting landowner ownership of lava extensions to his land.

The Supreme Court of the United States has many times been called upon to resolve disputes involving title to newly created lands. As stated by Justice Black in *Hughes v. Washington,* 389 U.S. 290, 293 (1967):

A long and unbroken line of decisions of this Court establishes that the grantee of land bounded by a body of

---

[7] See Chinen, J. Original Land Titles in Hawaii (1961) for examples of the wording of the various documents of title. Each recites the interest conveyed as "in Fee Simple."

navigable waters acquires a right to any natural and gradual accretion formed along the shore.

The instant case is, of course, distinguishable from true accretion cases in that the additional land here was not formed by "the gradual deposit of soil due to the action of a bounding river, stream, lake, pond, or tidal waters." Powell on *Real Property*, Vol. 7 § 983 (1976). Instead, it was formed by one of the most violent and spectacular geophysical processes known: a volcanic eruption and ensuing lava flow. I do not dispute the validity of this distinction.

However, both true accretion and lava extensions share certain characteristics: both are formed by natural processes which extend fast land into a body of water, both could adversely affect the riparian or littoral quality of the abutting landowner's interest, and neither contemplates the taking of property from one person or entity and giving it to another. When the policies which underlie the doctrine of accretion are examined, they seem equally compelling where the subject land is created by volcanic action as by imperceptible accumulation. The predominant policy concern in accretion cases has been protection of the private owner's littoral or riparian status. As stated in *Hughes v. Washington, supra* at 293: "Any other rule would leave riparian owners continually in danger of losing the access to water which is often the most valuable feature of their property . . . ." This policy would seem to apply with undiminished force in cases involving lava extensions attaching to oceanfront property in Hawaii.

The majority does not find this analogy compelling but after considering the policies which underlie the common law doctrine of accretion, rejects them, not, I believe, because they are not pertinent and reasonable but because they must be rejected in order to accomplish a result which the majority considers worthy.

2. Construction of Conveyances. There is a common law rule that, in construing a written document which describes a parcel of land, to the extent that there is a conflict in the description of the parcel, natural monuments will control over distances and azimuths. This principle has been adopted by the Hawaii Supreme Court and applied to the construction

of land court decrees. *McCandless v. Du Roi*, 23 Haw. 51 (1915) and *In Re Application of Sanborn*, 57 Haw.___(March 23, 1977). In *Sanborn* the court held that even where a private landowner held a land court decree which purported to describe the makai boundary of his property as "along the high water mark" followed by a description in azimuths and distances of the high water line, this description was in error and the true makai boundary was the vegetation line as set out in *County of Hawaii v. Sotomura*, 55 Haw. 176, 677 (1973). The fact that HRS 501-71 provides that every land court decree "shall bind the land, and quiet title thereto . . ." and that such decree "shall be conclusive upon and against all persons, including the State . . . " was considered insignificant because the public trust doctrine, under which all land makai of the vegetation line is held by the State in trust for the public, can "be deemed to create an exception to our land court statute . . . ." 57 Haw.___. However, the court chose not to rely solely on this application of the public trust doctrine and went on to expound the common law rule of construction set out above. Under this rule, the court reasoned, the natural monument, the high water mark, would control over the distances and azimuths with which the land court sought to describe this line. The "true measure of high water mark in this jurisdiction is the upper reach of the wash of the waves", *Sanborn* 57 Haw. at___(1977), "which is the vegetation line," *Sotomura* at 182.

In the instant case the appellees argued before the trial court that this principle of construction should be applied to their case. They pointed out that their deed recited the high water mark as their makai boundary and that this natural monument (the location of the shoreline) should control over the azimuths and distances by which their deed described the makai boundary. The majority now decides that the makai boundary of the Zimrings' land is to be the line set out in azimuths and distances despite the fact that this is inconsistent with the location of the natural monuments used as reference points.

This decision seems at odds with *Sanborn* and especially with *McCandless v. Du Roi*, 23 Haw. 51 (1915), a case which

the *Sanborn* court cited as a correct application of the common law rule of construction to land court decrees. *McCandless* involved a boundary dispute in which an 'auwai (ditch) demarcated the boundary between two parcels. The *Sanborn* court quoted with approval the following language from *McCandless:*

> It has been decided again and again that the meander line is not a boundary, but that the body of water whose margin is meandered is the true boundary.

23 Haw. at 56.

If this principle was applied to the instant case in a manner consistent with its application in *Sanborn*, the State would not be able to take title to the newly created land as it would be within the area described by natural monuments in the Zimrings' deed. If, as the majority states in *Sanborn* at___, it has been the settled law since 1915, then the State's Attorney General clearly was on notice that the appellees claimed all land to the high water mark as recited in their deed and correctly and properly acknowledged by their dealings with appellees in negotiating an easement for a roadway over a portion of the newly created land that the new land, to the high water mark, belonged to appellees.

C. The court decided that the government's right to take lava extensions to seashore boundaries was an inchoate right appurtenant to public land which was ceded by the Republic to the United States in 1898 and, upon the maturing of this right by the creation of the land in 1955, was ceded back to the State by the Admission Act of 1959. The Kingdom and the Republic, however, treated lava extensions as belonging to the abutting landowners.

It is not disputed that the lava extension which is the subject of this case was created in 1955. Nor can it be disputed that the State of Hawaii did not come into existence until 1959. Thus any title to this land which may be claimed by the State must have devolved to the State from the United States government. The law which governed the transfer of property rights from the United States government to the new State of Hawaii was the Admission Act of 1959 (Public Law

86-3). Section 5(a) of that act contains the basic grant through which the State contends that it received title to the subject lava extension.

The United States grants to the State of Hawaii, effective upon its admission to the Union, the United States title to *all the public lands and other public property* . . . (emphasis added).

Section 5(g) of the same act states:

As used in this act, the terms "lands and other properties" includes public lands and other public properties, and the term 'public lands and other public property' means *and is limited to* the lands and properties that were *ceded to the United States by the Republic of Hawaii under the joint resolution of annexation* approved July 7, 1898 (30 Stat. 750) or that have been acquired in exchange for lands or properties so ceded (emphasis added).

Thus for the State of Hawaii to have received title to the subject lava extensions from the United States in 1959, the State had to show that the Republic of Hawaii ceded these lands or the right to these lands to the government of the United States in 1898. Clearly the Republic could not cede lands not in existence but it arguably could cede an inchoate right to future lava extensions if such a right existed. As stated by the majority, the Republic could have ceded something less than its entire bundle of property rights and interests, yet it chose voluntarily to cede and quitclaim *all* of its property interest. Such intent appears in the joint resolution of annexation in which the Republic of Hawaii ceded to the United States:

all other public property of every kind and description

belonging to the Government of the Hawaiian Islands, together with every right and appurtenance thereunto appertaining. (Resolution No. 55, of July 7, 1898, 30 Stat. 750, 2 Supp. R.S. 895)

Therefore, it is clear that if the Government of the Republic of Hawaii did hold a right to take title of future lava extensions, this right was transferred to the United States Government in 1898. Yet nowhere is it argued, much less

proven, that the Republic of Hawaii, or its predecessor in title, the Kingdom of Hawaii, claimed or recognized a property interest in future volcanic additions to the Islands. On the contrary, the appellees introduced substantial evidence, discussed below, which tended to show that the Kingdom of Hawaii did not claim title to all volcanic additions to the islands without regard to the ownership of the shoreline property. Even if appellees' evidence is not, as the majority holds, sufficient to prove an Hawaiian usage, it is certainly probative of the fact that the Kingdom did not recognize or claim an interest in future lava extensions. If the Kingdom did not assert its claim to lava extensions as they were created, but instead determined title to be in the abutting landowner, can it be realistically said that the Kingdom of the Hawaiian Islands held the right to all future lava extensions and ceded this right to the Republic of Hawaii which in turn ceded such right to the United States which in turn ceded this same right to the State of Hawaii?

As this court stated in *In Re Application of Ashford*, 50 Haw. 314, 317 (1968), "Property rights are determined by the law in existence at the time such rights are vested. *In Re Title of Pa Pelekane*, 21 Haw. 175 (1912); *Keelikolani v. Robinson, supra; In Re Kakaako*, 30 Haw. 666 (1928); *Harris v. Carter*, 6 Haw. 196 (1877)''. The law which was in existence at the time the alleged right to future lava extensions vested in the government was the law of the Kingdom of Hawaii; the law in existence at the time the land was created was the law of the United States.

The evidence produced by the appellees and uncontroverted by the State clearly shows that under the laws of the Kingdom of Hawaii, title to lava extensions vested in the owner of the shorefront property to which the extension attached. Thus the property right to take title to future lava extensions vested not in the government but in the abutting landowner, whether private or public, and was not an inchoate right or appurtenance of public land which was ceded from the Republic to the United States or from the United States to the State of Hawaii.

## II. HAWAIIAN CUSTOM AND USAGE PRIOR TO
## 1892 GAVE TITLE TO LAVA EXTENSIONS TO
## THE ABUTTING LANDOWNER

The court decided that the subject land did not become part of the appellees' land through custom and usage, but the documentary evidence supports the conclusion that Hawaiian custom and usage treated such extensions as belonging to the abutting landowner.

The issue of Hawaiian custom and usage raised by the appellees in this case has been before this court on a prior occasion. In *Zimring v. State,* 52 Haw. 472 (1970) this court reversed a summary judgment granted by the trial judge (then Judge Felix) in part on the ground that the evidence of custom and usage presented by the appellees, an affidavit of a kamaʻaina witness,[8] failed to meet the requirement implicit in HRS 1-1 that the usage alleged predate November 25, 1892.[9] The affiant, William Kamau Sr., had stated that in light of his special knowledge[10] he believed:

> that as new land is created which destroys the shoreline and creates a new shoreline, the abutting owner's right to his seashore boundary gives him the ownership of the new land.

52 Haw. at 473.

The State had introduced no evidence on this point but the court held:

---

[8] A kamaʻaina witness is a person "familiar from childhood with any locality". In Re Boundaries of Pulehunui, 4 Haw. 239, 245 (1879). This would also include "persons who were specially taught and made repositories of this knowledge . . . ." *Id.*

[9] HRS 1-1 provides:

Common law of the State; exceptions. The common law of England, as ascertained by English and American decisions is declared to be the common law of the State of Hawaii in all cases, except as otherwise expressly provided by the Constitution or laws of the United States, or by the laws of the State, or fixed by Hawaiian judicial precedent, or established by Hawaiian usage . . . .

The predecessor of HRS 1-1, L. 1892, c. 5765, was approved on November 25, 1892 and has been construed to include only usages established before that date. De Freitas v. Trustees of Campbell Estate, 46 Haw. 425, 380 P.2d 762 (1963); Zimring v. State, 52 Haw. 474-475 (1972).

[10] He was born in Puna in 1892 and lived there all his life. His mother and hanai father were also born on the island. He had worked as a surveyor for 40 years.

The usage Kamau deposed to might have had reference to facts he observed, and his mother and hanai father observed, in connection with volcanic eruptions after November 25, 1892. If so, such facts did not establish the kind of usage meant in HRS 1-1.

52 Haw. at 475.

The cause was remanded for trial and at trial Mr. Kamau was not called as a witness by either party. Instead the appellees adduced other evidence tending to show an established Hawaiian usage which gave title of newly created lava-land to the abutting seashore owner.

The development of competent usage evidence relevant to this issue was complicated by the limited time frame within which such usage must have existed. To be relevant the usage alleged must deal with lava extensions abutting *privately owned land,* but in Hawaii private ownership of land did not begin until the Great Mahele of 1846. Thus the usage evidence must deal with new land created between 1846 and 1892 which attached to privately owned land. With these constraints it cannot be surprising that "there is a paucity of evidence in this area."

The appellees and the *amicus curiae*[11] adduced evidence upon which the trial court found, in Findings of Fact 13:

The evidence established that in the period between 1800 and the present time there were 13 lava flows that added land area to the seashore. Of these 13, only three occurred between 1846, when private land ownership originated in Hawaii, and November of 1892. It was established that two of these flows crossed private seashore land and added new land. One flow, that of 1868, added land to a previously granted Land Commission Award, granted in 1854. The evidence showed that the Boundary Commission (1876) and the Royal Patent, issued in 1877, both followed the new shoreline and included newly created land. Both the Boundary Commission and the Royal Patent expressly referred to the 1868 flow.

---

[11] The Bishop Estate.

The majority does not reject these findings but holds that they are insufficient to establish a customary usage. I must dissent from this holding as I believe that the 1868 lava flow and the governmental response thereto provide ample evidence of an established usage which is reinforced by other evidence produced at trial. An understanding of the factual and legal context surrounding the determination of ownership of the 1868 lava extension is essential to an understanding of its great importance in documenting Hawaiian usage.

In 1854 the Land Commission awarded to Victoria Kamamalu the ahupua'a of Pakini Nui by name only. In 1861 a Royal Patent, No. 4475, was issued to V. Kamamalu covering this land. Due to the scarcity of surveyors in Hawaii during this period, it was standard practice for the Land Commission to issue awards by name only, but in 1862 a statute was enacted requiring awardees to apply to the Boundary Commission, established in the same act, to have the boundaries of their land determined and certified. (Act of August 23, 1862, Laws of Hawaii 1862, p. 57 § 3.)

After the 1868 lava flow overran the shoreline of Pakini Nui and added a considerable amount of new land to the ahupua'a,[12] the successor to the title of the awardee went before the Boundary Commission, pursuant to the 1862 statute, for certification of the boundaries of her land. The Commission determined that this new land was within the boundaries of Pakini Nui and issued a certificate which specifically mentioned the 1868 flow in its metes and bounds description of the boundaries.[13] In 1877 the Minister of Interior issued a second Royal Patent, No. 6887, which conformed to the Boundary Commissioner's determination.

---

[12] Precisely how much new land was created in 1868 does not appear in the record; however, the Hawaiian Gazette of May 6, 1868 (Vol. IV no. 16) reported that the flow "[c]aused a projection of more than half a mile . . . . "

[13] The description of the boundaries of Pakini Nui included in Royal Patent No. 6887 (Amicus Curiae Exhibit 3) and Boundary Certificate No. 83, Feb. 23, 1876 (Amicus Curiae Exhibit 2) reads: "along the boundary of Kahuku to a place called *Kaumuula* at the shore: South 76 ½° East 185.70 *chains along the shore of a volcanic hill on the lava flow of 1868* to the point of commencement." (emphasis added.)

The majority finds this evidence inconclusive because the Boundary Commissioner, R. A. Lyman, did not set forth the reasons for his determination. The boundary commissioners were under no statutory duty to set out the reasons for their conclusions but the Statute of 1862, *supra,* creating the commission did set out guidelines and procedures for the commissioners to follow in making their decisions.

> SECTION 4. It shall be the duty of said Commissioners, on the receipt of such application as above, to notify the owner or owners of the land and also those of the lands adjoining, of the time when they will be prepared to hear their case. They shall receive at such hearing all the testimony offered, shall go on the ground when required by either party, and shall endeavor otherwise to obtain all information possible, to enable them to arrive at a just decision as to the boundaries of said lands.

Laws of Hawaii 1862, 28.

Further amplification of the criteria used by the boundary commissioners is found in decisions of this court reviewing, on appeal, determinations of the Commission. In *Henry Cornwell v. Board of Education,* 4 Haw. 540, 543 (1882), an action for false representations stemming from a dispute over the boundaries of the ahupua'a of Pulehunui which had been determined by the Boundary Commission and reviewed in the Supreme Court, this court stated:

> The Boundary Commissioner bases his determination principally on *tradition as known to the oldest native residents.* In the case of Waikapu and Pulehunui the Boundary Commission, and subsequently the Supreme Court *found in such testimony* that a large tract which had been held by the Government at Waikapu . . . was included in ancient Pulehunui (emphasis added).

In its review of the commissioner's determination of Pulehunui, *In Re Boundaries of Pulehunui,* 4 Haw. 239 (1879), the supreme court reviewed the testimony of several kama'aina witnesses presented before the commission and sustained the commissioner's findings:

It becomes apparent that as part of his statutory duty "to obtain all the information possible" a commissioner would

consider tradition or custom as relevant if not controlling evidence. Thus official response to this 1868 lava extension has two-pronged relevancy. First, due to the statutory duty to get all information possible and the Supreme Court's approval, in other cases, of the use of kama'aina testimony as to traditional practice, it may be inferred that the Boundary Commissioner's determination was made with knowledge of a traditional practice, or at the least, was not contrary to an existing usage. Second, is the fact that the commissioner, in making his determination, was actually recording an Hawaiian usage and establishing it as a precedent in Hawaiian real property law. This second prong is of crucial importance, for in determining the boundaries of Pakini Nui in 1876, the commissioner heard a case of first impression in Hawaii. The 1868 flow was the first flow subsequent to 1846 which added new land to a privately owned parcel. This was the first instance in modern Hawaii where a government official as part of his statutory duties, was called upon to determine this question at an official adjudicatory hearing.[14] This official's function was to determine boundaries according to statutory criteria and existing practice, and we should presume that he performed his function properly.[15] His decision then is not only evidence of a preexisting custom; it created the official usage of the custom as the basis for determining the boundaries of land, and gave the custom official sanction and recognition. Then in 1892 when the statute which was the predecessor of HRS 1-1 was enacted, this usage became a part of the law of Hawaii.

---

[14] A boundary determination by a commissioner is a quasi-judicial proceeding. The commissioner would receive an application, set a hearing date, notify all possible adverse claimants, and determine the boundaries from the evidence produced. See Laws of Hawaii 1862, Act of August 23, 1862, 28-29, § 9. "The said Commissioners shall have like power to administer oaths, to punish contempts, to grant adjournments, to subpoena and compel attendance of witnesses, and issue executions for costs, as is conferred by law upon Police Courts.

Sec. 9 of the Act of 1862 became Sec. 8 of the Act of 1868 extending the Commission. The last sentence was amended to read "conferred by law upon Police or District Justices."

[15] On appeal the reviewing court may presume that "public officials lawfully performed, or will perform their duties, and acted in good faith, and that statutory requirements were complied with." 5 C.J.S. S 1534, 1055-56.

A decision of the Boundary Commissioner is not, of course, of the same precedential value as a decision of this Supreme Court. However, one function of HRS 1-1 is to provide the people of Hawaii with another source of law, one which is not derived from the legislature or from supreme court decisions. Once established and officially recognized, the precedential value of an Hawaiian custom or usage should be in parity with that of a legislative act or judicial decision. HRS 1-1 is an express limitation on the applicability and development of the common law to areas not inconsistent with practices established by Hawaiian usage.

The record from the trial court contained other evidence of an existing Hawaiian usage giving title to lava extensions to the abutting land owner. The trial court found that in 1887 a lava flow crossed the Kahuku land of one C. C. Harris, extending his shoreline boundary. In this instance there was no governmental determination of boundaries, but the lava extension was marked on tax maps as belonging to Mr. Harris.[16] Assuming arguendo that the government is not bound by its acquiescence for more than 85 years in its tax department's treatment of this land, the tax treatment is still probative of an established and officially accepted usage. The majority is of the opinion that tax map treatment "reveals only what the tax department assumed about ownership of land." I would ask: on what did they base their assumption? It seems clear that where all government pronouncements or responses to the creation of lava extensions between 1846 and 1892 are consistent with each other and with the usage now asserted by appellees, the government should at least introduce some evidence to rebut the usage alleged. The Tax Department treatment of lava extensions as belonging to the abutting landowner continued at least until 1968, as taxes paid by the Zimrings on the subject land were accepted without comment.[17]

---

[16] See Trial Court's Findings of Fact No. 13, p. 5-6.
[17] See Trial Court's Findings of Fact No. 6, p. 5.

Further, other departments of the Territorial and State governments indicated by their actions that the Zimrings. were owners of the lava extensions created in 1955. In his Findings of Fact, Judge Fukuoka stated:

> 5. On October 23, 1961, the State and Zimrings entered into a mutual deed, drafted by the State, to settle a matter relating to easements on Grants 4139 and 4140. The deed recited that Zimrings were owners of the parcels to high water mark, using the same description. Attached to that deed was a sketch of the lands added by the 1955 flow. *To the left and right of the parcel now in dispute were new lands abutting old Government lands. These new lands were labeled "Government lands; the land now in dispute was clearly set off from these parcels and was not labeled Government land.* The State should have had knowledge, before the deed was drafted and executed, of the additions of the land now in dispute. *The State gained an easement in this land now in dispute. The State gained an easement in this transaction, but remained silent on any claims it had.* Prior to that time, *the Attorney General of the State had examined Zimrings' Certificate of Title, which contained a description to a seashore boundary, and declared it to be satisfactory* (emphasis added).

Finding of Fact No. 5, p. 5-6.

A pattern of governmental practice beginning in 1876 with the Boundary Commissioner's determination that the lava addition to Pakini Nui belonged to the abutting owner, and continuing for approximately 92 years is demonstrated by the evidence; the origins of this practice rest in the history of ancient Hawaii. Although it is beyond dispute that Hawaiian usage must be established prior to 1892, there is evidence from the government's response to the lava flows of 1868 and 1887 that such usage existed. Further, where governmental treatment of lava extensions created subsequent to 1892 is consistent with the pre-1892 treatment, this is strong evidence that such a custom did obtain prior to 1892 and was considered binding by the government.

The majority now holds that the evidence adduced was insufficient to establish the asserted usage. This seems inconsistent with recent decisions by this court involving the use of custom and usage. In *In Re Application of Ashford*, 50 Haw. 314, 315-316 (1968), this court stated:

Hawaii's land laws are unique in that they are based on ancient tradition, custom, practice, and usage. *Keelikolani v. Robinson*, 2 Haw. 514. The method of locating the seaward boundaries was by reputation evidence from kamaainas and by the *custom and practice of the government's survey office*. It is not solely a question for a modern day surveyor to determine boundaries in a manner completely oblivious to the knowledge and intention of the King and old time kamaainas who knew the history and names of various lands and the monuments thereof (emphasis added).

The *Ashford* case involved a boundary dispute between a shoreline property owner and the State as to the location of a shoreline boundary. At trial the State produced two kamaʻaina witnesses "for the purpose of establishing by reputation evidence, the location of ʻMa ke kai'[18] and also the location of public and private boundaries along the seashore in accordance with tradition, custom, and usage in old Hawaii.'' 50 Haw. at 315. On the basis of the testimony of two witnesses, this court found that the State owned all land makai of the "edge of vegetation or line of debris''. 50 Haw. at 316. A sample of this testimony is found in the dissent of Justice Marumoto:

Q. Mr. Kahinu, have you heard what old-timers who are now deceased say according to Hawaiian custom, tradition and practice, where the location of a public boundary and the private boundary is along the seashore in Hawaii?

.        .        .        .        .

A. All I hear the old-timers say the high water mark is where the water gets to the end, out in the seashore, I

[18] The description of the properties contained in Royal Patent 3004 and 3005 issued February 22, 1866 recited the shoreline boundary as "ma ke kai'' meaning "along the sea.''

mean the toppest part of the seashore where it meets the grass. All they say that is the high water mark.

This court had no difficulty finding such testimony sufficient to establish an Hawaiian usage in *Ashford* but now holds that: (1) an adjudication by a boundary commissioner in 1876, (2) an official document issued in 1877 by the Minister of Interior, signed by the King (Royal Patent 6887), (3) Tax Department treatment of an 1887 lava flow acquiesced in by the governments of Hawaii for 85 years, (4) Tax Department treatment of the lava extension created in 1955 (accepting taxes), (5) Territorial and State surveyors' (the "government surveyors" referred to in the *Ashford* case, *supra*) consistent practice of mapping newly formed lava land extending the seashore as having accreted to the abutting landowner's property, and (6) government action (including approval by the Attorney General) in which the State negotiated with the Zimrings for an easement across the lava extension, are insufficient to establish a similar usage. The evidence received in *Ashford* was hearsay, albeit admissible due to necessity, whereas here there was documentary evidence directly on point as well as other evidence, documentary and testimonial, which amplified and reinforced the original direct documentary evidence. I would find this evidence sufficient to establish the usage alleged by appellees.

The position occupied by Hawaiian custom and usage in the jurisprudence of this State is far higher than that of traditional common law custom and usage. Hawaiian usage is law derived from our island's history and is of equal dignity with laws derived from our legislature and courts. See HRS 1-1, *In Re Application of Ashford,* 50 Haw. 314 (1968).

As stated by this court in *Ashford, supra* at 315, "Hawaii's land laws are unique in that they are based on ancient tradition, custom, practice, and usage." So too, Hawaiian usage is unique because Hawaiian land law is based on it. By the terms of HRS 1-1, Hawaiian usage, once established, controls over general common law precedent to the contrary. *In Re Application of Ashford, supra; County of Hawaii v. Sotomura,* 55 Haw. 176, 177 (1973). This court has, in the *Ashford* and *Sotomura* cases, relied on Hawaiian usage

to establish the seashore boundaries of private and public land. The court found the boundary to be the vegetation line, whereas traditional American practice and common law would contemplate private ownership of all land mauka of the high water mark. The *only* evidence of the public ownership of all land makai of the vegetation line was kama'aina testimony as to Hawaiian usage. The court considered itself bound by the usage established. In the instant case, the appellees offer direct documentary proof and other circumstantial evidence of an Hawaiian usage not inconsistent with existing common law, but the usage so proved is rejected as being insufficient. As time progresses it will become increasingly difficult to produce competent evidence of historical usage. Those who could have provided kama'aina testimony will have passed on, if they have not already. Instead of kama'aina testimony, courts will have to accept documentary evidence of Hawaiian usage. This court will again have occasion to decide what level of documentary evidence is sufficient to establish a usage, but with this case as a precedent, it is hard to imagine what evidence could meet the degree of certainty apparently required.

### III. THE STATE IS PRECLUDED FROM DENYING APPELLEES' TITLE IN THE SUBJECT LAND

The Findings of the trial court numbered 4, 5, 6, 7, 8, 9, 10, 11 and 12 were supported by the evidence adduced by defendants at trial. No contrary evidence was offered by the State, nor did the State's attorney cross examine appellees' witness in respect to the testimony relating to these findings. The appellees' evidence was thus uncontroverted.

Equitable estoppel extends to the State of Hawaii. *Yamada v. Natural Disaster Claims Commission,* 54 Haw. 621, 513 P.2d 1001 (1973). I believe that the State should be estopped from claiming title in this lava extension not only on the basis of the State's specific actions vis á vis this land and these appellees, but also should be estopped from asserting a claim to this and to other lava extensions abutting private lands heretofore created, on the basis of the actions of the

agents of the State and its predecessor governments in respect to the ownership of all other new land abutting former seaward boundaries created by lava flows.

This decision of the court counts not only for the future, as the majority states, but operates virtually as an ex post facto law depriving other land owners of lava-created holdings which the governments of Hawaii, including all branches and departments of these governments dealing with land other than this court, have consistently and without deviation treated as the property of the abutting owners.

The Governor of the Territory of Hawaii in 1931, Executive Order 473, Setting Aside Land for Public Purposes, set aside public lands created in 1926 by a lava extension to lands owned by the government for a public park to be controlled by the County of Hawaii, but excluded from the Order "the accretion to Grant 1581 to Kama . . . and accretion to L. C. Award 8045 Apana 1 to Anadarea . . . ." The lands excluded adjoined and were surrounded by the government land, but they represented a seaward lava extension to privately owned land. Survey and tax maps clearly delineate the extensions to government land as belonging to the government. Even in the only piece of evidence adduced by the State to suggest that there was a question as to "ownership of lava flow land into the ocean," a letter dated March 9, 1931 from Charles L. Murray, Assistant Government Surveyor, to Robert D. King, Territorial Surveyor, Mr. Murray acknowledged that the government might have some interest in the 1926 lava accretion credited to private Grant 1581 to Kama *only because before the flow, the beach was used as the main government road in that vicinity.*

At no time between the Great Mahele in 1846 and 1968, did any sovereign government make any claim to any seaward addition to a privately-owned preexisting land mass created by a volcanic eruption. Maps presented in evidence which were prepared by State agents prior to 1968 designate the seaward additions as "lava accretions" and all distinguish between the accretions which belong to the government, (those which extended the government's land) and those lava

accretions which belonged to private owners (those which extended privately owned land).

Not until the Attorney General consulted with the State Surveyor preparatory to bringing this action did the State Surveyor replace the words "lava accretion" by the words "lava flow" on maps pertaining to the 1955 flow.

At the instruction of the Attorney General during the course of these proceedings, the State Surveyor made a search for data on lands created by lava flows but was unable to find any documentation tending to support the State's post-1965 claim to all lands created by lava flows.

It is clear that until the mid-1960's, the official acts of the Governor, the State Surveyor, the Board of Land and Natural Resources and the Tax Department (or their predecessor agencies which performed the same functions) as well as the Boundary Commissioner, all uniformly treated lava extensions as if they belonged to the abutting landowner. Based on this consistent course of conduct of all government officials and agencies, the State should be precluded from denying the title to lava extensions of all private landowners whose seashore boundaries were overrun by lava flowing into the sea from the eruptions of 1887, 1919, 1926, 1950, 1955, 1960, 1971-73.

I find the newspaper account of the position of the State prior to 1965 in respect to ownership of oceanfront land created by lava flows to be both accurate and telling: "Previously, the State had operated on the assumption that the land belonged to the person who held title to the shoreline that existed before the lava flow." Hawaii Tribune-Herald, May 12, 1965.

Whatever the majority perceives the public policy ought to be in respect to the ownership of lava created in the future, I believe that equity requires the State to acknowledge that the official actions of all its agents compel the State's recognition that title to lava extensions created prior to this decision, or at least prior to 1965, rests with the abutting landowner.

Although the majority states that the record does not support a finding that the Zimrings informed the State of their belief of ownership in 1961, the Zimrings presented a Certificate of Title which described one course of the boundary as "along the high water mark." In light of the subject matter of the negotiations between the Zimrings and the State, *i.e.*, the realignment of a roadway necessitated by the lava flow's destruction of the prior roadway along the seashore, and in light of the special legal knowledge of that arm of the State which inspected the Certificate of Title, the Attorney General, I agree with the trial court that the knowledge of the Zimrings' claim is imputed to the State.

Further negotiations in 1964 resulted in the granting of an easement in the disputed land to the State by the Zimrings. The State, through the Attorney General, the State Surveyor and the Department of Transportation, must then have acknowledged the Zimrings' ownership of that disputed land in order to accept a deed from them as grantors. And it should be noted that attached to these 1961 and 1964 deeds were maps (prepared by the State Surveyor), which clearly show that the lava extensions (designated as "lava accretions") abutting the Zimrings' grants were accepted by both the State and the Zimrings as belonging to the Zimrings, whereas the lava extensions abutting adjacent state property were designated as belonging to the State. In its Opening Brief (p. 36), the Attorney General acknowledges that attached to the deeds of 1961 wherein the Zimrings granted the State a mauka-makai roadway, and attached to the deeds of 1964 wherein the State grants to Zimrings title to the old road right of way, are maps which show that the makai boundary of the new government road "goes slightly makai of the old high water mark of the grants in question. This overlapping, however, is purely coincidental . . . ." Coincidental it may be, but it serves as clear proof that in negotiating with the Zimrings for that portion of the new roadway which was in the now disputed lava extension, the State had certain knowledge of the Zimrings' claim to the extension and the Attorney General negotiated on the basis of the Zimrings' title in and to the extension.

For the majority to aver that in collecting real property taxes from the Zimrings on the new land, "the tax department acted beyond its authority" is to ignore the entire history of the State's dealing with private landholders who claimed abutting lava extensions from the 1868 flow through 1965. The State, and its Tax Department, could scarcely feign ignorance of the fact that lava flows had overrun seashore boundaries of private owners in that nearly hundred years and that the State's actions (or actions of its predecessors) in respect to these newly created lands had legal significance.

I believe the trial court's Findings of Facts are amply supported by the undisputed evidence and are a sufficient basis, even without more, for dismissing the State's action to quiet title in the subject land.

### IV. APPLICATION OF FEDERAL LAW IN
### DETERMINING STATUS OF SUBJECT LAND

The link which was fashioned by the majority in the State's claimed title to the subject lava extensions, *i.e.* that the Republic had an inchoate right to all future lava extensions, which right was granted to the United States by the Joint Resolution of Annexation in 1898 and granted back to the State under the Admission Act of 1959, was not advanced by the Attorney General. Thus this theory of State ownership was not addressed by appellees. No evidence was submitted to nor received by the trial court, nor argument briefed for this court, as to whether the law of the United States, which was the sovereign law at the time this land was created, should be consulted or is controlling as to the status of the subject land. No consideration has been given to whether it is the prerogative of a United States court to determine, in the event of a disputed issue, what land was ceded to the State under the Admission Act.

I believe these questions are worthy of further inquiry, particularly as many acres of land have been created by lava flows which extend the seaward boundaries of United

States-owned land in Hawaii Volcanoes National Park.[19] Should not the United States government be heard as to whether or not it ceded to the State lava extensions which were created when it was sovereign, particularly when that determination now controls who owns the lava extensions which abut United States lands?

## V. PUBLIC POLICY

Implicit in the analysis of the majority on the issues of the origin of the State's title to the lava extensions, and the effect of the evidence of Hawaiian custom and usage, and explicit in their analysis of the common law of accretion, is the majority's belief that the public policy of this State favors the State's taking title to the subject land. In dealing with the issue of the common law of accretion the majority does not rest with distinguishing alluvian from lava accretions or extensions on the basis that the former attaches gradually and imperceptibly to the shoreline property. Instead it goes on to note that the law of accretion is based upon a public policy which favors preservation of the littoral owners' access to the ocean. The majority reasons that if a common law doctrine has a basis in public policy, then before the court will give effect to that doctrine the policies which support it must be weighed against whatever countervailing public policies are deemed relevant by the court.

Consequently, before the policies which underlie the law of accretion are given weight, the majority believes these policies (specifically "the interest of the former littoral owner seeking to regain access to the ocean") must be balanced

---

[19] Since the date of the Admission Act (March 18, 1959) several lava flows have caused acres of lava extensions to be accessioned to the seaward boundaries of the Hawaii Volcanoes National Park. According to the reasoning of the majority these lava lands would belong to the State as they were never "set aside" for federal uses and purposes. It could reasonably be argued that these new lands are federal lands because they attached to lands which *were* "set aside" for federal purposes (Hawaii National Park, Act of April 19, 1930 (200, 46 Stat. 227)). However, this reasoning would also demand a conclusion that ownership of lava extensions which attach to privately owned land should vest in the upland private landowner.

against "the interest of the public at large, the original and ultimate owners of all Hawaiian lands." Although the majority does not state with precision the nature of the public's interest, they find that it would be inequitable to allow the former littoral owner to receive the new acreage as a windfall and hold that due to "the paucity of land in our island state and the concentration of private ownership in relatively few citizens, a policy enriching only a few would be unwise. Thus we hold that lava extensions vest when created in the people of Hawaii . . . ." This holding, and the public policy which it seeks to express, deserves careful scrutiny.

First, it is important to note that if title to the subject lava extensions were awarded to the private land owner, the people of the state would lose nothing. Public access to the ocean would be preserved along the strip of land between the vegetation line and the ocean itself. See *In Re Application of Ashford*, 50 Haw. 314 (1968); *County of Hawaii v. Sotomura*, 55 Haw. 167, 177 (1973). Thus the people of Hawaii are deprived of nothing, but retain exactly what they had before the creation of the new land. Whatever benefit may be derived from state ownership of this land, should it prove to be necessary for the public good, could be accomplished through eminent domain as with all other private land.

It is true that there is a paucity of land in Hawaii and a concentration of private land ownership in a few individuals and entities. However, it should be noted that while large private landowners[20] together own 1,918,000 acres and smaller private owners[21] own only 270,219 acres, the State Government owns 1,585,000 acres, making the State far and away the largest single landowning entity in Hawaii.[22]

---

[20] Defined as private owners with 1,000 acres or more in fee simple. *Land Use and Ownership Trends in Hawaii, Statistical Report 98 –December 28, 1973, Department of Planning & Economic Development, State of Hawaii.*

[21] This figure includes County land acquired by purchase or gift in the name of the county. *Id.* at 25.

[22] These statistics are found in the report from the State Department of Planning and Economic Development cited in note 1, *supra*. I take judicial notice of these facts in part because they are facts capable of certain verification and in part because these are "legislative facts" not contained in the record but which find expression, albeit generalized, in the majority opinion.

This court has earlier recognized public policy as an important consideration in its boundary decisions. In *Ashford, supra,* and *Sotomura, supra,* and *Sanborn, supra,* public policy was part of the ratio decidendi of the case. In fact a search for consistency between the decisions of this court in *Ashford, Sotomura* and *Sanborn* on the one hand and the majority decision in the instant case on the other will yield only that in all circumstances the State took title to the shoreline property in dispute. I believe that the true precedent for the majority's decision here is found in *Sotomura, supra* at 182.

> Public policy, as interpreted by this court favors *extending* to public use and ownership as much of Hawaii's shoreline as is reasonably possible (emphasis added).

Although I do not here dispute the rectitude of this policy,[23] I believe that the majority serves their policy goal of public land acquisition by a means which violates other, more basic public policies, policies so basic they found expression in our Constitutions. Both the United States Constitution and the Constitution of the State of Hawaii prohibit the public taking of private property without due process and just compensation. These provisions are a limitation on the power of the government to "extend to public use and ownership"

---

[23] This court, in *Sanborn, supra,* found no constitutional infirmity with its decision that, pursuant to the 1973 *Sotomura* decision, the State held title to all land makai of the vegetation line despite the fact that in *Sanborn* the landowner had a 1951 Land Court decree which described both as the high water mark and in azimuths and distances a shorefront boundary line some 40-45 feet makai of the vegetation line. The court reasoned that "the absence of a clear legal standard in 1951 tends to disprove the existence of a reasonable expectation in 1951 that the Land Court would be able to fix conclusively the distances and azimuths of the high water mark." 57 Haw. at___. No doubt a similar analysis would be applied in the instant case. However I believe that the legal standards here were established by custom and usage, by the common law, and by the employ of government practice regarding lava extensions, were clear and were correctly applied by the trial judge. I feel that citizens always have a reasonable expectation of consistency from the government unless the government openly undertakes a policy change and compensates those citizens who have relied on the now-abandoned policy.

the shoreline lands or any other privately owned land. It does not matter whether the illegal extension is made by legislative act or judicial decision; if the extension violates the basic policies expressed in the Constitution it is void, even if it furthers other desirable policies. I quote the concurring opinion of Mr. Justice Stewart in *Hughes v. Washington*, 389 U.S. 290, 298 (1967):

> The Constitution measures a taking of property not by what a State says, or by what it intends, but what it *does*. Although the State in this case made no attempt to take the accreted lands by eminent domain, it achieved the same result by effecting a retroactive transformation of private into public property — without paying for the privilege of doing so (emphasis in original).

If the public policy announced in *Sotomura* and implicit in *Ashford* is so compelling, the additional burden of paying for the land acquired should be a small sacrifice compared to the sacrifice of basic values required to take title to this land without paying for the privilege of doing so.

### CONCLUSION

The majority has decided that this new land *should* belong to the State. If their decision had been based explicitly on this policy judgment, I would not dissent so vigorously, though I would wish to have the question at least briefed and argued by the litigants. However, I believe the evidence shows that the successive governments of Hawaii have consistently treated lava extensions as belonging to the shoreline owner. I dissent now because I believe that citizens deserve and have an inherent right to consistency and fairness in their dealing with the State. I realize that the State has a duty to protect the freedom and welfare of *all* her people, but I believe this begins with protecting the rights and interest of *each* person in every transaction which involves the State. This is the Public Policy which I would throw into the balance of

competing interests which guided the majority to its decisions. So weighted, the balance would, I would hold, tip toward the appellees, and thus toward others situated as are appellees who stand to lose their lands to the State by this decision.

I would affirm the decision of the Circuit Court.